1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE FRANKLIN BUTZ, | 1:10-cv-00435-OWW-SMS (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| | [Doc. 1] |
| JAMES D. HARTLEY, | |
| Respondent. | |
| _____/ | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) following his conviction of second-degree murder with use of a weapon. Petitioner is serving an indeterminate sentence of sixteen years to life.

In the instant petition, Petitioner does not challenge the validity of his conviction; rather, he challenges the Board of Parole Hearings' (Board) March 4, 2008 decision finding him unsuitable for release.

Petitioner filed a petition for writ of habeas corpus in the Santa Barbara County Superior Court challenging the Board's 2008 decision.  The superior court denied the petition in a reasoned decision finding some evidence to support the Board's decision.

1    Petitioner filed petitions for writs of habeas corpus in the California Court of Appeal and

2    California Supreme Court, and both petitions were denied without comment.

3    Petitioner filed the instant federal petition for writ of habeas corpus on March 11, 2010.

4    Respondent filed an answer to the petition on July 16, 2010, and Petitioner filed a traverse on

5    September 24, 2010.

6                                    STATEMENT OF FACTS[1]

7    In 1994, Petitioner and his girlfriend, Cammie Horn, rented an apartment above the

8    garage on Oak Park Lane in Santa Barbara, California.  Petitioner quarreled with his landlord,

9    Fred Rossi, and in November of 1994, Petitioner physically attacked him.  Rossi, aged 78,

10   obtained a restraining order against Petitioner and changed the lock to the apartment.  In March

11   of 1995, Rossi filed an unlawful detainer action to evict Petitioner and his girlfriend.  Rossi

12   inspected the apartment complex on a daily basis and looked for recyclable items in the trash.

13   Out of fear of Petitioner, Rossi changed his schedule on March 9, 1995, and made his rounds at

14   4:30 a.m.  Rossi thought that Petitioner and Horn had moved out and decided to retrieve some of

15   the patio furniture he loaned them.  Rossi was carrying a chair when Roy Cortez, a tenant in the

16   apartment complex, drove up.  Cortez was 51 years old, African American and weighed 120

17   pounds.  Petitioner overheard Rossi open the apartment window and shouted, "What are you

18   doing down there, Fred?  Stay away from my shit."  Petitioner saw Cortez and screamed, "And

19   you too, you fucking nigger, what are you doing?  Are you working with Fred,' or helping Fred?

20   Stay away from my shit.'" Rossi walked away.  Petitioner taunted Cortez and shouted, "You get

21   back here too, nigger, I'm going to kick your ass.  Give me back my stuff.  I know you're helping

22   him.'" Cortez in a quiet voice replied, "Stay back, I don't want any of your stuff.  You all don't

23   pay any rent here anyway."  Petitioner yelled, "Well you know I have a .357 up here and I'm

24   coming down there."  Cortez retrieved a stick from his van and said, "Well, come down here,

25   white boy."  Petitioner took his Raven Fantasy Fighter knife out of the box and ran down the

26   stairs.  A neighbor heard a noise that sounded like a sword fight.  Petitioner danced back and

27   _____

28        [1] This information is taken from the 2008 Board hearing which quoted the appellate court's decision.

                                              2

forth with the knife and ultimately stabbed Cortez in the chest.  Another tenant saw him run back to the apartment and leave two or three minutes later.  The police responded to several 9-1-1 calls and found Cortez dead face down in a large pool of blood.  Petitioner surrendered later that morning.  Petitioner said he threw the knife near Mission Street and Highway 101 on-ramp but the police never found the knife.

DISCUSSION

I.    Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.   Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

II.   Review of Petition

There is no independent right to parole under the United States Constitution; rather, the right exists and is created by the substantive state law which defines the parole scheme.  Hayward v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010).  "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause."  Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is suitable for parole is controlled by the following regulations:

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found

unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

       (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b).  Section 2402(c) sets forth circumstances tending to

demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

     (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
     (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
     (C) The victim was abused, defiled or mutilated during or after the offense.
     (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
     (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.'

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9).

The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing.  Cal. Penal Code § 3041.5.  If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute.  Id.  In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential.  In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause.  Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d at 609.  Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state

court's application of the some evidence rule was unreasonable or was based on an unreasonable

determination of the facts in light of the evidence.  Hayward v. Marshall. 603 F.3d at 563;

Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of

the Board or the Governor that the inmate constitutes a current threat to public safety, and not

merely whether some evidence confirms the existence of certain factual findings."  In re

Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted).  As to the

circumstances of the commitment offense, the Lawrence Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances
> of the commitment offense as a basis for a decision denying parole, the aggravated
> nature of the crime does not in and of itself provide some evidence of current
> dangerousness to the public unless the record also establishes that something in
> the prisoner's pre- or post-incarceration history, or his or her current demeanor
> and mental state, indicates that the implications regarding the prisoner's
> dangerousness that derive from his or her commission of the commitment offense
> remain probative to the statutory determination of a continuing threat to public
> safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors

related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to

the determination that a prisoner remains a danger to the public.  It is not the existence or

nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the

significant circumstance is how those factors interrelate to support a conclusion of current

dangerousness to the public."  In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the

central issue of *current* dangerousness when considered in light of the full record before the

Board or the Governor.'"  Cooke v. Solis, 606 F.3d at 1214 (emphasis in original) (citing

Hayward v. Marshall, 603 F.3d at 560).

A.    Last Reasoned State Court Decision

In the last reasoned state court decision of the Santa Barbara County Superior Court, the

court denied the petition, stating in relevant part:

The [Board] found that the crime was carried out in a dispassionate manner.  Petitioner claims the record does not support this finding.  The record reflects that petitioner was very agitated at his landlord and engaged in a heated argument with the landlord and the victim.  However, the court of appeals noted that petitioned told a cell mate the "he looked out the window and decided to 'butcher this toad.'"  The witness said "toad" means "a black person" in "penitentiary ling." [citation]  The record also supports the [Board] finding that the motive for the crime is inexplicable and trivial.  Legal eviction proceedings and the retrieval of a loaned chair are not strong motivations for violence.  Petitioner initiated the provocative racial epithets.  From the safety of his upstairs apartment, petitioner "threatened the victim, grabbed his knife, and ran down the stairs intending to "butcher" the "victim." [citation]

15 CCR 2402(b)(2): Petitioner has a long history of arrests, including a previous record of violence, including a prior assault with a deadly weapon and shooting into an inhabited dwelling.

15 CCR 2409(b)(6): [Petitioner] apparently had two "115" citations for serious misconduct in prison.  He says the incident for fighting is nearly a decade old.  IT is unclear in the record whether the fighting incident was in 2001 [citation] or 2004 [citation].  In his evaluation report, the correctional counselor's reported that, on September 16, 2004, petitioner was placed in administrative segregation for mutual combat.  However, the "115" was dismissed at a hearing on October 5, 2004. [citation]

15 CCR 2402(c)(3): Petitioner claims he has shown signs of remorse.  Although he says he deeply regrets what happened to Cortez [citation], he continues to insist that he believes he took Cortez' life in self defense [citation].  He told the commissioners: "And I don't know if you quite understand the circumstances.  Um, nobody has stated that I was being beaten with a club at the time when I stabbed Mr. Cortez." [citation] There is no evidence that petitioner "performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense." 15 CCR 2402(c)(3).

Evidence in the record supports the overall conclusion that petitioner would pose an unreasonable risk of danger to society if released from prison.  The psychologist concluded that petitioner posed a moderate risk of violence if released based on historical, clinical and future plans analyses. [citation].  The commissioners concluded that Cortez needs to better understand why he committed the crime and what he needs to do to achieve personal growth.  Before this court, petitioner minimizes engaging in "mutual combat" both in describing the crime–"Petitioner's act of fighting outside with the victim and away from others as he danced back and forth with the knife and stabbed Mr. Cortez in the chest as they fought each other with a knife and a stick does not indicate anything." [citation]– and the fighting in prison [citation].  He says: "Put in the psych report note, page 4, that fight have included people underestimating petitioner?" [citation] He does not explain that thought.  There is nothing in the psychological evaluation suggesting that people underestimate him or any other mitigating factor for the fight.

(Ex. 2, to Answer, Decision, at 3-5.)

B.      2008 Board Hearing

At Petitioner's initial Board hearing in 2008, the Board found Petitioner unsuitable for release based on the circumstances of the commitment offense, prior criminal history, institutional misconduct, unfavorable psychological report, questionable parole plans, and lack of sufficient self-help programming.

The unfortunate victim was not the original subject of the argument, but was the ultimate victim of Petitioner's anger that evening.  After arguing with the victim, Petitioner left the safety of his apartment armed with a knife and confronted the victim to a physical challenge.  Petitioner danced back and forth with the knife and then stabbed Mr. Cortez in the chest.  Petitioner fled the scene while Cortez was laying face down on the ground in a pool of blood.  There was evidence before the state appellate court that Petitioner told a cell mate that when Petitioner looked out the window he decided to "butcher this toad [the victim]."  The cell mate explained that "toad" referred to "a black person" in "penitentiary lingo."  The motive was certainly trivial as Petitioner became enraged because of his landlord's retrieval of loaned patio furniture.  The Board found the commitment offense was carried out in an especially cruel manner.

Petitioner has an extensive amount of arrests dating back to 1977 and continuing intermittently up to the commitment offense.  Of particular relevance is the fact that Petitioner suffered convictions for assault with a deadly weapon and shooting at an inhabited dwelling–both demonstrating a prior propensity toward violence.  Cal. Code Regs. tit. 15, § 2402(c)(2).

The most recent psychological report by Dr. Catherine Tooley, was not favorable of Petitioner's release.  Dr. Tooley assessed Petitioner to be in the "moderate" range for future violence if released.  Such finding was properly considered by the Board and superior court as a factor in determining whether Petitioner remains a current risk to public safety.  See e.g. Hayward, 603 F.3d at 563 (psychologist's evaluation that prisoner posed a "low to moderate" risk of future violence, coupled with evidence that offense was particularly aggravated, is sufficient evidence to demonstrate future dangerousness to support denial of parole.)

Petitioner has suffered two serious rules 115 violations, the most recent in 2001 for failure to comply and the prior for mutual combat.  Cal. Code Regs. tit. 15, § 2402(6).  The

1  Board considered this evidence but did not weigh it very heavily.

2          The Board had serious concerns regarding Petitioner's desire to reside with a prior inmate

3  upon his release.  The Board expressed the potential problems that may arise if Petitioner is

4  housed with a parolee or former parolee.  Petitioner was advised to find a alternative living

5  arrangement upon release in California.

6          The Board further noted that although Petitioner had participated in Alcoholics

7  Anonymous (AA), it was too recent and further work was required in order for Petitioner to

8  thoroughly understand and articulate the Twelve Step program.

9          After considering the factors in support of suitability, the Board concluded that the

10  positive factors did not outweigh the factors in support of unsuitability, and the superior court's

11  determination that the circumstances of the commitment offense, prior criminal history,

12  institutional misconduct, unfavorable psychological, insufficient self-help programming, and

13  questionable parole plans demonstrate Petitioner continues to remain an unreasonable risk to

14  public safety is not an unreasonable application of the some evidence standard, nor an

15  unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d).

16                                    <u>RECOMMENDATION</u>

17          Based on the foregoing, it is HEREBY RECOMMENDED that:

18          1.      The instant petition for writ of habeas corpus be DENIED; and

19          2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

20          This Findings and Recommendation is submitted to the assigned United States District

21  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

22  Local Rules of Practice for the United States District Court, Eastern District of California.

23  Within thirty (30) days after being served with a copy, any party may file written objections with

24  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

25  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

26  and filed within fourteen (14) days after service of the objections.  The Court will then review the

27  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

28

1    failure to file objections within the specified time may waive the right to appeal the District

2    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3

4

5

6

7

8

9         IT IS SO ORDERED.

10   **Dated:     November 3, 2010**                      _____/s/ Sandra M. Snyder_____
                                                          UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28